IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                               No. 25-cr-01770-MLG

TEVIN KING,

    Defendant.

## MOTION TO DISMISS INDICTMENT OR IN THE ALTERNATIVE SUPPRESS DRUG LAB EVIDENCE

Defendant Tevin King, through counsel, The Law Office of Ryan J. Villa, by Richelle Anderson, pursuant to the Sixth Amendment to the United States Constitution, *Gideon v. Wainwright*, 372 U.S. 335 (1963), *Ake v. Oklahoma*, 470 U.S. 68 (1985), and Criminal Justice Act (CJA), 18 U.S.C. § 3006A, respectfully moves the Court to dismiss the Indictment in this matter due to the United States Congress's intentional withholding of funding necessary under the CJA for defense counsel to provide constitutionally adequate representation, which necessarily includes the ability to retain an expert forensic chemist, and renders Mr. King's continued prosecution fundamentally unfair and violates his right to effective assistance of counsel.

### I.    RELEVANT BACKGROUND

On May 28, 2025, the United States charged Mr. King in an Indictment with unlawful possession with intent to distribute 400 grams and more of a mixture and substance containing Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi). *See* Indictment [Doc. 2]. This charge stems from the high-speed pursuit of Mr. King by Homeland Security Investigations and other federal officers in eastern New Mexico on August 19, 2024, and the discovery of approximately 14,000 pills in a duffle bag thrown from the vehicle. *See* Amended Violation Report [Doc. 92] (filed in *U.S. v. King*, 21-cr-00268-MLG). Mr. King was arrested the same day, and the

1

pills were later tested by the Department of Homeland Security and appear to have tested positive for Fentanyl. *See generally* **Exhibit 1**, Department of Homeland Security Drug Lab Report. If convicted, Mr. King faces a statutory mandatory minimum sentence of at least 10 years imprisonment and maximum term of life. *See* 21 U.S.C. § 841(b)(1)(A)(vi).

On May 30, 2025, defense counsel was appointed pursuant to the Criminal Justice Act (CJA), to represent Mr. King in the instant case. *See* CJA Appointment [Doc. 9]. Mr. King's expert deadline was continued to August 8, 2025, and trial in this matter is set for September 8, 2025. *See* Orders [Doc. 19, 21]. Defense counsel was initially appointed to represent Mr. King nearly a year ago in connection with his pending supervised release case. *See* CJA Appointment [Doc. 87] (filed in *U.S. v. King*, 21-cr-00268-MLG).

On July 15, 2025, the United States Courts publicly confirmed that payments to CJA panel attorneys and CJA service providers had been suspended nationwide as of July 3, 2025, due to budget shortfalls.[1] The budget shortfall was the direct result of Congress intentionally underfunding Defender Services. Payments are not expected to resume until at least October 1, 2025 for CJA panel members and service providers.[2] The following day, the One Big Beautiful Bill Act was passed by Congress and signed into law by the President.[3] Despite allocating "a historic" $165 billion dollars to the Department of Homeland Security,[4] the law enforcement

---

[1] *See U.S. Courts, Funding Crisis Leaves Defense Lawyers Working Without Pay,* U.S. Courts (July 15, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay (last visited July 15, 2025).

[2] *See id.*

[3] *See* H.R.1 - 119th Congress (2025-2026): One Big Beautiful Bill Act, H.R.1, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-bill/1 last visited July 15, 2025).

[4] *See* U.S. Dep't of Homeland Sec., Secretary Noem Commends President Trump and "One Big Beautiful Bill" Signing into Law (July 4, 2025), https://www.dhs.gov/news/2025/07/04/secretary-noem-commends-president-trump-and-one-big-beautiful-bill-signing-law (last visited July 15, 2025).

agency involved in Mr. King's vehicle pursuit and that oversaw the forensic drug testing in his case, no funding was allocated to prevent the CJA funding shortfall.

The current funding crisis did not come as a surprise. The United States Congress has consistently demonstrated an unwillingness to adequately fund federal Defender Services, including the CJA.[5] In 2025, the "Judiciary's Defender Services program was … significantly underfunded" receiving "$129 million below the necessary level."[6] In an April 10, 2025 letter prepared by Seventh Circuit Judge Amy J. St. Eve, chair of the Budget Committee of the Judicial Conference of the United States, and Judge Robert J. Conrad Jr., director of the Administrative Office of the U.S. Courts and secretary of the Judicial Conference to the House of Representatives Appropriations Committee, these judges warned Congress:

> [A]n estimated $92 million of payments to private attorneys appointed by federal courts to represent defendants under the Criminal Justice Act (CJA) and necessary service providers will have to be suspended effective July 23, 2025, with payments delayed until October 2025 (FY 2026). These are payments for constitutionally required legal work that has already been performed but that will be left unpaid for months simply because we cannot afford to make the payments. Faced with such a long delay in receiving payment, these attorneys and their experts could decline to accept future CJA appointments by a court, potentially creating unlawful delays in the constitutional right of defendants to a speedy and fair trial. In addition, the deferral of payments will substantially increase the Judicial Branch's FY 2026 appropriations requirements to cover the deferred payments and restore base funding.[7]

---

[5] *See e.g.,* Chief Judge William B. Traxler, Jr., Chair of Executive Committee of the Judicial Conference of the United States, Statement on Impact of Sequestration on Judiciary, Defender Funding (April 17, 2013), https://www.uscourts.gov/data-news/judiciary-news/2013/04/17/statement-impact-sequestration-judiciary-defender-funding (last visited July 28, 2025) (explaining that due to funding shortalls "[c]riminal prosecutions have been delayed because defender organizations do not have the staff necessary to continue their representation of the defendant or the funds to pay for experts or other cases costs.").

[6] Administrative Office of the U.S. Courts, Funding Shortfalls Adversely Affect Key Judiciary Programs, U.S. Courts (Apr. 18, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/04/18/funding-shortfalls-adversely-affect-key-judiciary-programs (last visited July 17, 2025).

[7] Administrative Office of the U.S. Courts, *FY 2025 Funding Request Letters to Congress* (Feb. 15, 2024), https://www.uscourts.gov/sites/default/files/document/fy-2025-funding-request-letters-to-congress.pdf. (last visited July 17, 2025).

Even before this, the United States Congress has repeatedly failed to timely pass funding appropriation bills, requiring instead continuing resolutions to fund judicial services.[8] The judiciary has been ringing the alarm for months, if not years, clearly indicating that Congress's refusal to adequately fund the CJA, as required to effectuate the Sixth Amendment rights of criminal defendants, is deliberate and intentional. The willful and targeted nature of Congress's decision to withhold funding for the CJA is further demonstrated by the fact that, unlike any other part of the judiciary or prior government shutdowns, only CJA panel attorneys and CJA service providers are expected to continue working without pay. Congress has further demonstrated its unwillingness to address this issue given that even though CJA funding is depleted, the House of Representatives adjourned though September 1 without addressing the current budgeting shortfall.[9] Even if CJA payments resume in October, it remains to be determined whether the backlog of unpaid CJA voucher will be prioritized, when the vouchers will be paid, and how long funding will last given funding for FY 2026 will be absorbing a quarter of unpaid CJA obligations from FY 2025. If Congress deliberately underfunds 2026 or funding proceeds on a continuing resolution rather than a funding bill, and this funding does not make up for the 2025 backlog, funding for fiscal year 2026 could run out as early as March of 2026.

Underfunding is likely to continue, as the House of Representatives is poised to approve next year's Defender Services budget at $196 million below the requested amount. *See* **Exhibit 2**, Administrative Office of the United States Courts Memo Re: House Action on FY 2026 Judiciary Appropriations at 2. According to Judge Conrad, if enacted, "[r]eductions of this magnitude would

---

[8] *Id*.

[9] *See* U.S. House of Representatives, Floor Proceedings (July 23, 2025), https://live.house.gov/?date=2025-07-23, (last visited July 25, 2025) (noting that "Pursuant to clause 13 of Rule I, the Chair announced the Speaker's designation of the period from Wednesday, July 23, 2025, through Monday, September 1, 2025, as a 'district work period.'")

4

inhibit the Defender Services program from meeting its constitutionally mandated mission." *Id*.

## II.   LAW AND ARGUMENT

### A.   DISMISSAL OF THE INDICTMENT OR SUPPRESSION OF THE DRUG LAB EVIDENCE IS WARRANTED DUE TO THE VIOLATION OF MR. KING'S SIXTH AMENDMENT RIGHTS

**1.   The Sixth Amendment's Guarantee to a Meaningful Defense**

The Sixth Amendment guarantees that: "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held this to mean "that …. counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived." *Gideon v. Wainwright*, 372 U.S. 335, 339–40 (1963). In *Gideon* the Court explained that

> The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. *This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him*.

*Id*. at 344 (emphasis added).

Since then, the Court has held that criminal defendants are not only guaranteed the right to counsel but entitled to effective representation and provided access to the tools necessary for a meaningful defense. *See Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) (listing cases). As the Court unequivocally explained in *Ake*:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and *that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense*. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary

> system. *To implement this principle, we have focused on identifying the basic tools of an adequate defense or appeal, and we have required that such tools be provided to those defendants who cannot afford to pay for them.*

*Id*. at 77 (cleaned up) (emphasis added). Weighing these practical but important considerations, the *Ake* Court held that denying an indigent defendant access to a psychiatric evaluation to support his insanity defense violated his right to due process and required reversal and remand of his state murder convictions. *Id.* at 72, 86–87. In doing so, the Supreme Court emphasized that "interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk" and the Court's increased "recognition … of elemental constitutional rights" requires "assuring *meaningful access to the judicial process*." *Id*. at 78, 85 (emphasis added). The Tenth Circuit considers three factors in determining what basic tools are required for a meaningfully adequate defense. *United States v. Kennedy,* 64 F.3d 1465, 1473 (10th Cir. 1995). These include:

> (1) the effect on [the defendant's] private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered.

*Castro v. Ward*, 138 F.3d 810, 826 (10th Cir. 1998) (quoting *Kennedy*, 64 F.3d at 1473).

2. **The Criminal Justice Act's Fulfillment of the Promise to a Meaningful Defense**

Because a right without a remedy is no right at all, a year after the Supreme Court's decision in *Gideon v. Wainwright*, Congress enacted the Criminal Justice Act to require the appointment and compensation of counsel to represent defendants "financially unable to obtain counsel" and to require that such defendants shall receive the tools (*i.e.*, assistance of investigators and experts) "necessary for an adequate defense." 18 U.S.C. § 3006A(b), (d)-(e); *see also United States v. de Hernandez*, 745 F.2d 1305, 1310 (10th Cir. 1984) (explaining that the standard for the appointment of counsel under the CJA is not indigency but whether the accused is "financially unable to obtain counsel"). "[T]he Act carries both a statutory and a constitutional mandate." *United States v.*

6

*Barcelon*, 833 F.2d 894, 896 (10th Cir. 1987).

As the Courts recognize, the work of CJA counsel and CJA service providers "greatly strengthen[] the fairness and integrity of our system of justice" and help balance the system.[10] Despite this, the United States Congress has knowingly allowed the CJA to run out of money triggering a "painful" one-sided delay in paying CJA counsel and CJA service providers "for constitutionally mandated legal work."[11] As Judge Eve, recently remarked: "The right of a criminal defendant to effective counsel regardless of the defendant's economic status is guaranteed under our Constitution and the Criminal Justice Act. That fundamental right is at risk because we ran out of funding on July 3 to pay the private practice attorneys appointed to represent federal defendants."[12] As a result of the Congress's deliberate decision to not adequately fund the CJA, Judge Eve's warning is proving accurate, and Mr. King's Sixth Amendment rights are being violated.

At the core of the Sixth Amendment, *Gideon v. Wainwright*, and the CJA is the recognition of a criminal defendant's right to a meaningful defense in the face of a prosecution by the United States. However, a defense can only be meaningful if it is adequately funded. As the maxim "an army marches on its stomach" suggests, meaningful participation in any adversarial conflict requires adequate resources. A party to an adversarial conflict must be properly equipped to meaningfully challenge their opponent.

---

[10] *See* Administrative Office of the U.S. Courts, *Criminal Justice Act: 50 Years of a Landmark Right to Counsel*, U.S. Courts (Aug. 20, 2014), https://www.uscourts.gov/data-news/judiciary-news/2014/08/20/criminal-justice-act-50-years-a-landmark-right-counsel (last visited July 16, 2025).

[11] *See* Administrative Office of the U.S. Courts, Funding Crisis Leaves Defense Lawyers Working Without Pay, U.S. Courts (July 15, 2025), https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay (last visited July 16, 2025).

[12] *See id.*

3. **The Ability to Obtain Expert Services**

While there are many ways the United States's CJA funding crisis is directly and indirectly affecting Mr. King's defense, one of them has been defense counsel's ability to retain a forensic chemist to assist in the review the Homeland Security Drug Lab Report. *See* **Ex. 1**, Department of Homeland Security Drug Lab Report. The lab report appears to indicate that a subsample of 36 of the ~14,000 pills seized from the duffle bag allegedly thrown from the vehicle were tested pursuant to a "statistically based subsampling plan" and "at least 70% of the population contain[ed] Fluorofentanyl and Fentanyl." *See id*. at 1. Defense counsel is not trained in forensic chemistry or statistics and her ability to consult with a qualified forensic chemist about the laboratory's statistical testing methodology and testing results is essential to Mr. King's defense.

Defense counsel has consulted with Heather Harris, MFS, JD, ABC-CC, ABC-DA, a forensic chemistry expert with over 20 years of experience in forensic analysis and laboratory procedures and a professor of forensic science in Glenside, Pennsylvania. *See* **Exhibit 3**, Harris CV. Ms. Harris is board-certified by the American Board of Criminalistics in both Comprehensive Criminalistics and Drug Analysis. *See id.* Her standard hourly rate for private clients is $350.00; however, consistent with the practice of many CJA service providers, she has historically agreed to accept a reduced rate for CJA cases, in recognition of the longstanding reliability of the federal government to provide timely compensation. *See* **Exhibit 4**, Harris Fee Schedule. While Ms. Harris has been willing to consult on CJA cases for a reduced hourly rate, this does not mean she can work without the expectation of timely compensation for her work or expenses. The uncertainty of CJA repayment aside, she would otherwise be willing to consult with defense counsel in connection with Mr. King's case, including a detailed review of the Department of Homeland Security Drug Lab Report and potential travel and testimony at *Daubert* hearings, trial,

and sentencing if necessary. *See* **Exhibit 5**, Harris Declaration.

In this case, an expert like Ms. Haris is a "basic tool" for Mr. King's adequate representation. While the present circumstances do not fit precisely into the existing framework established by the Tenth Circuit in *Kennedy*, they come close enough to demonstrate that Congress's refusal to timely fund this expert service implicates Mr. King's Sixth Amendment rights. First, Mr. King's private interest in the accuracy of the trial is severely implicated given he faces a mandatory minimum sentence of at least 10 years if convicted. *See Kennedy*, 64 F.3d at 1473. Next, the burden on the United States if the expert is timely compensated is negligible and immaterial. *See id*. Finally, such an expert will provide great value to Mr. King's defense at trial, while the risk of proceeding to trial and potentially sentencing without defense counsel consulting with such an expert increases the risk of error and potentially conviction. *See id*.

The forensic drug evidence in this case is not collateral, it is the heart of the United States' only indicted charge against Mr. King. Denying defense counsel the ability to meaningfully challenge that evidence through the assistance of a timely and reliably compensated expert to consult regarding the statistical testing methods employed in Mr. King's case and the quantity and appearance of certain drug analogs in the test results fundamentally skew the adversarial process and deprives Mr. King of the Sixth Amendment rights. Mr. King is entitled to the Sixth Amendment right, which includes meaningful access to the tools necessary to defend himself.

Without funding for defense counsel and defense experts to effectively prepare Mr. King's defense for trial due to the United States's CJA funding crisis, his prosecution is constitutionally intolerable. In this case, Congress's failure to fund CJA to ensure that the guarantees of the Sixth Amendment, the Supreme Court's holding in *Gideon v. Wainwright*, and the CJA are met, Mr. King is being deprived of the right to counsel and the dismissal of the Indictment is required.

### 4. The Ability of Defense Counsel's to Provide Effective Representation

Defense counsel is tasked with effectively preparing for and completing Mr. King's trial without timely compensation for her necessary time, costs, expenses, or experts. While "[i]t is necessary to keep in mind that appointments under the CJA are to protect the rights of the indigent accused, and they are neither to be sought nor made for the purpose of providing income to attorneys" and that "acceptance of a CJA appointment is equivalent to agreeing to perform a public service," *United States v. Green*, 18 F. Supp. 3d 1234, 1240–41 (D.N.M. J. Johnson) (2013) (citations omitted), this does not mean that defense counsel are expected to work for months without being paid. Under the CJA appointed panel attorneys are required to be compensated at an hourly rate for both in-court and out-of-court work. *See* 18 U.S.C. § 3006A(d)(1). "Any attorney appointed pursuant to this section, . . . *shall*, at the conclusion of the representation or *any* segment thereof, be compensated." *Id*. (emphasis added). "Both the plain language of the Criminal Justice Act and the legislative history establish that attorneys who provide services under the Act are entitled to receive payment for all time expended that is reasonable and necessary for the representation." [13]

Mr. King's case demonstrates the fundamental unfairness created by the current CJA crisis: one day, his court-appointed counsel and service providers expected to work without pay due to Congress's refusal to fund the CJA; the next, Congress passes a law allocating an unprecedented $165 *billion* to the very federal agency that arrested him. The United States cannot have it both ways. If it chooses to prosecute defendants who are financially unable to obtain counsel and retain experts it must also fund the means for those defendants to meaningfully defend themselves. *See*

---

[13] *See* Report of the Ad Hoc Committee to Review the Criminal Justice Act, U.S. Courts (Nov. 2017) at 97-98, available at www.uscourts.gov/sites/default/files/2017_report_of_the_ad_hoc_committee_to_review_the_criminal_justice_act-revised_2811.9.17.29_0.pdf (last visited July 17, 2025).

U.S. Const. amend. VI, *Gideon*, 372 U.S. 335 (1963), *Ake*, 470 U.S. 68 (1985), and CJA 18 U.S.C. § 3006A.

    **5. The Appropriate Remedy is Dismissal of the Indictment or Suppression of the Drug Lab Report**

"Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison,* 449 U.S. 361, 364 (1981). The approach taken by the courts "has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id*. at 365. "[T]he constitutional infringement identified" must threaten or present "some adverse effect upon the effectiveness of counsel's representation" to warrant a judicial remedy. *Id*. Without evidence of a prejudicial "impact on the criminal proceeding … there is no basis for imposing a remedy" in a case that can otherwise "go forward with full recognition of the defendant's right to counsel and to a fair trial." *Id*.

In this case, the prejudice Mr. King faces is immediate and structural. Congress's decision to intentionally underfund and allow CJA funding to lapse, while still fully funding felony prosecutions, creates an unbalanced system in which indigent defendants are left without the resources necessary to mount a meaningful defense. Mr. King's case exemplifies the constitutional harm *Morrison* warns against. Defense counsel is expected to represent Mr. King without timely compensation and without the ability to consult with an adequately funded and necessary expert. These are not abstract grievances or inconveniences. The right to effective assistance is hollow if Mr. King's defense cannot afford to analyze forensic evidence or consult experts.

This is not a budget oversight. The CJA funding crisis is resulting in constitutional injury with direct and adverse effects on counsel's ability to render effective assistance. A system in

which CJA counsel and CJA service providers are expected to bankroll the criminal defense of federally prosecuted clients from personal business funds or by going into debt is fundamentally incompatible with the promises of the Sixth Amendment. Allowing Mr. King's prosecution to proceed under these conditions impermissibly places the defendant's constitutional rights at the mercy of the government's self-created CJA funding crisis.

This Court has the authority and the obligation to fashion relief that neutralizes the infringement on Mr. King's Sixth Amendment rights. Given the United States' deliberate failure to adequately fund the CJA, while simultaneously continuing to prosecute Mr. King, the appropriate remedy is dismissal of the Indictment. In the alternative, the Court should suppress the Department of Homeland Security's Lab Report as Mr. King cannot meaningfully challenge that evidence without the assistance of a forensic chemist expert. In the event the Court finds neither remedy appropriate and continues Mr. King's trial, any resulting delay should be counted against the prosecution for speedy trial purposes.

### B.  THE CJA FUNDING CRISIS INVITES STRUCTURAL ERROR

Forcing Mr. King to trial without meaningful access to the resources necessary for this defense in violation of the Sixth Amendment will constitute structural error in the event of his conviction. The Supreme Court has explained that:

> The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself.

*Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017) (internal quotation marks omitted). The Supreme Court has provided "three broad rationales" for classifying an error as a structural error. *Id*. First, an error may be structural where "the right at issue is not designed to protect the defendant

from erroneous conviction but instead protects some other interest." *Id*. at 595. Second, an error may be structural if "the effects of the error are simply too hard to measure." *Id*. at 595-96. Finally, an error may be deemed structural if the error "always results in fundamental unfairness." *Id*. at 569. "Any one of these rationales or a combination thereof may explain why an error has been deemed structural." *United States v. Trujillo*, 960 F.3d 1196, 1205 (10th Cir. 2020) (citing *Weaver*, 582 U.S. at 295).

Structural errors "def[y] analysis by harmless error standards." *United States v. Bruce*, 127 F.4th 246, 257 (10th Cir. 2025), cert. denied, *Bruce v. United States*, 2025 WL 1787812 (U.S. June 30, 2025). Errors are structural, and "thus subject to automatic reversal on appeal" in a limited class of cases, including, "for example, the denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *Id*. at 257 (cleaned up). In this case, Mr. King's prosecution in the current environment satisfies all three rationales for a structural error determination to be made in the event of his conviction.

**1. The Right at Issue is Protection of Mr. King's Right to a Fair Trial**

First, the right at issue is not protection from erroneous conviction, but rather protection of Mr. King's right to a fair trial, including his right to effective representation and access to the basic tools necessary for a meaningful defense. *See Ake*, 470 U.S. at 77. The Sixth Amendment requires that indigent defendants have an adequate opportunity to present their claims fairly within the adversary system, including that the basic tools of an adequate defense are provided. *Id*. The Court has found structural error in cases where defendants were denied counsel, *Gideon*, 372 U.S. 335 (1963), or denied counsel of their choice, *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Because different attorneys will pursue different strategies, including strategies in regard to

13

investigation and the development of defense theories, the "erroneous denial of counsel bears directly on the framework within which the trial proceeds." *Gonzalez-Lopez*, 548 U.S. at 150 (citing *Arizona v. Fulimante*, 499 U.S. 279, 310 (1991)) (citations omitted).

### 2. The Effects of the Error are Too Hard to Measure

Second, the effects of error confronting Mr. King's defense are by definition "simply too hard to measure." *Weaver*, 582 U.S. 295-96. Without an expert willing to work for months and pay for travel to New Mexico for trial out of her own pocket, all without the certainty of compensation, defense counsel will be required to strategize theories of defense, pertaining primarily to the statistical testing methodology and results of the Department of Homeland Security Lab Report, without the necessary training and skills that are essential to Mr. King's defense.

Another consequence of the current funding crisis is that it risks creating the perception of conflict between counsel and Mr. King given that the lack of funding may introduce doubts about counsel's financial tolerance and ability/willingness to defend his case. Although defense counsel is determined to provide effective representation, it is not hard to sympathize with a client's concern that counsel will cut corners or spend less time on his case, knowing that CJA payments for his case are not expected for months and counsel has bills to pay now. *See McFarland v. Scott*, 512 U.S. 1256, 1258 (1994) (Blackmun, J., dissenting from denial of certiorari) (explaining that inadequate funding "unquestionably chills even a qualified attorney's zealous representation of his client.") Counsel's pretrial efforts and perceptions of potential conflict affect the entire framework of the trial in ways that are impossible to measure. *See Weaver*, 582 U.S. at 295-96.

### 3. The Result is Fundamental Unfairness

Finally, the error in this case is structural because it results in fundamental unfairness. The

Sixth Amendment requires effective assistance of counsel at critical stages of criminal proceedings. Because of the presumption that assistance of counsel is essential, a denial of counsel at a critical stage requires the court to conclude that the trial is unfair. *See United States v. Cronic*, 466 U.S. 648, 659 (1984). "Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id*. This was true in *Davis v. Alaska*, where the Supreme Court held that the defendant being denied the right to effective cross-examination of a witness was "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." 415 U.S. 308, 318 (1974) (citing *Brookhart v. Janis*, 384 U.S. 1, 3 (1966). As discussed above, the core of the Sixth Amendment, *Gideon v. Wainwright*, and the CJA is the right to a meaningful defense, however, a defense can only be meaningful if it is funded. In this case, the United States has chosen to allocate $165 billion dollars to the most prominent federal agency involved in Mr. King's case while simultaneously depriving him of a meaningful defense. Such circumstances are fundamentally unfair.

Because requiring Mr. King to proceed to trial without meaningful access to the resources necessary for this defense in violation of the Sixth Amendment will constitute structural error in the event of his conviction inevitably requiring reversal, the Court should dismiss the Indictment with prejudice.

### III.     CONSULTATION WITH COUNSEL

Undersigned counsel contacted counsel for the United States, Assistant United States Attorney Sarah M. Mease, who states that the United States opposes this Motion.

## IV. CONCLUSION

Because the CJA funding crisis denies defense counsel compensation and interferes with her of the ability to retain and compensate a necessary expert, Mr. King is being actively deprived of meaningful defense in violation of the Sixth Amendment, *Gideon v. Wainwright* and its progeny, and the Criminal Justice Act. Accordingly, the Court should dismiss the Indictment or in the alternative suppress the drug lab evidence at trial.

    Respectfully submitted,
    The Law Office of Ryan J. Villa

    */s/ Richelle Anderson*
    RICHELLE ANDERSON
    5501 Eagle Rock Ave NE, Suite C2
    Albuquerque, New Mexico 87113
    (505) 639-5709
    Richelle@rjvlawfirm.com
    Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2025, a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

    */s/ Richelle Anderson*
    RICHELLE ANDERSON